# UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF CALIFORNIA

**DARRYL DARMONT SHIRLEY**,

                              Petitioner,

    v.

**JAMES A. YATES, et al.**,

                              Respondents.

No. 2:07-cv-01800-AK

**ORDER**

> "I can honestly say I don't think I've ever in my life personally encountered somebody as cross-eyed as Mr. Shirley."
>
>                    —Alan Van Stralen, deputy district attorney

The prosecutor was right.  Darryl Shirley's eyes <u>are</u> extremely crossed.  His left eye stares straight ahead, while his right eye stares across his face.  His mug shot makes clear that these crossed eyes are the defining feature of his face.  Nevertheless, when Detective Paul Biondi created a photo lineup in Shirley's case, he didn't include anyone else with crossed eyes.  The witness, who had told investigators that the perpetrator was cross-eyed, picked Shirley from the lineup and identified him later in court, leading to his conviction.

page 2

The California trial and appellate courts rejected Shirley's claim that he was identified based on a suggestive lineup.  In his habeas petition, Shirley now asks this court to examine whether the Court of Appeal's denial of that claim—the last reasoned decision in the case—was "contrary to, or involved an unreasonable application of, clearly established Federal law."  28 U.S.C. § 2254(d)(1).

**Facts**

In 2005, a California jury convicted Shirley of robbing $80 from a Subway restaurant.  According to one of the store clerks, the robber approached the counter and asked how much a cookie cost.  He then produced a dollar bill and, when the clerk opened the register, reached over the counter to snatch the money.  The clerk ran to the back room.  No weapons were shown.  Nor did the robber say anything to threaten the clerk.  In the same trial, Shirley was also convicted of an unrelated residential burglary, which occurred later that evening.

The punishment for the two convictions: 50 years to life plus 20 years of enhancements.

On federal habeas, Shirley raised a Batson claim.  This court concluded there was no Batson violation, after holding an evidentiary hearing in March.  See Order, Shirley v. Yates, No. 2:07-cv-01800-AK (E.D. Cal. Jan. 30, 2013), 2013 WL

page 3

394713.  The court now turns to Shirley's remaining claims: (1) the robbery

conviction involved a suggestive lineup that violated due process, and (2) the

robbery conviction was based on insufficient evidence.

## Discussion

### I.   Suggestive Lineup

A.   Clearly Established Federal Law

"The practice of showing suspects singly to persons for the purpose of

identification, and not as part of a lineup, has been widely condemned."  Stovall v.

Denno, 388 U.S. 293, 302 (1967).  Even when the suspect isn't shown singly,

however, the identification procedure can violate due process if it's "so

impermissibly suggestive as to give rise to a very substantial likelihood of

irreparable misidentification."  Simmons v. United States, 390 U.S. 377, 384

(1968).  Under clearly established Supreme Court precedent, a lineup violates due

process if (1) the lineup is impermissibly suggestive and (2) the resulting

identification lacks "sufficient aspects of reliability."  Manson v. Brathwaite, 432

U.S. 98, 106 (1977); Neil v. Biggers, 409 U.S. 188, 199 (1972).

1.  <u>Suggestive lineup</u>

In <u>United States</u> v. <u>Wade</u>, the Supreme Court described "numerous instances

of suggestive procedures":

> that all in the lineup but the suspect were known to the identifying
> witness, that the other participants in a lineup were grossly dissimilar
> in appearance to the suspect, that only the suspect was required to
> wear distinctive clothing which the culprit allegedly wore, that the
> witness is told by the police that they have caught the culprit after
> which the defendant is brought before the witness alone or is viewed
> in jail, that the suspect is pointed out before or during a lineup, and
> that the participants in the lineup are asked to try on an article of
> clothing which fits only the suspect.

388 U.S. 218, 233 (1967) (footnotes omitted).  The Court also cited other "striking

examples":

> In a Canadian case . . . the defendant had been picked out of a line-up
> of six men, of which he was the only Oriental.  In other cases, a black-
> haired suspect was placed among a group of light-haired persons, tall
> suspects have been made to stand with short non-suspects, and, in a
> case where the perpetrator of the crime was known to be a youth, a
> suspect under twenty was placed in a line-up with five other persons,
> all of whom were forty or over.

<u>Id.</u> at 232 (quoting Patrick M. Wall, <u>Eye-Witness Identification in Criminal Cases</u>

53).

Suggestive lineups, the Supreme Court has explained, are particularly

dangerous because they can taint later proceedings:  "Regardless of how the initial

misidentification comes about, the witness thereafter is apt to retain in his memory

the image of the photograph rather than of the person actually seen, reducing the trustworthiness of subsequent lineup or courtroom identification." <u>Simmons</u>, 390 U.S. at 383–84.  As the Court warned:  "A major factor contributing to the high incidence of miscarriage of justice from mistaken identification has been the degree of suggestion inherent in the manner in which the prosecution presents the suspect to witnesses for pretrial identification." <u>Wade</u>, 388 U.S. at 228.  Guarding against the effects of suggestive identification practices is critical to conducting a fair trial.

2.  <u>Independent reliability</u>

A suggestive lineup doesn't violate due process if the identification has independent reliability.  To determine whether there's such reliability, the Supreme Court requires courts to consider the "totality of the circumstances," including the following factors:  "[1] the opportunity of the witness to view the criminal at the time of the crime, [2] the witness' degree of attention, [3] the accuracy of his prior description of the criminal, [4] the level of certainty demonstrated at the confrontation, and [5] the time between the crime and the confrontation." <u>Manson</u>, 432 U.S. at 113–14.  Critically, the factors suggesting reliability must then be weighed "[a]gainst . . . the corrupting effect of the suggestive identification itself."

Id. at 114.  This last step—the weighing—never happened in petitioner's case.

### B.  Last Reasoned State-Court Decision

Under the Antiterrorism and Effective Death Penalty Act (AEDPA), we must grant habeas relief if the state court proceedings "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1).  "A state court decision is contrary to clearly established federal law if it failed to apply the correct controlling authority from the Supreme Court." Benn v. Lambert, 283 F.3d 1040, 1051 (9th Cir. 2002) (internal quotation marks omitted).  "The addition, deletion, or alteration of a factor in a test established by the Supreme Court also constitutes a failure to apply controlling Supreme Court law under the 'contrary to' clause of AEDPA." Id. at 1051 n.5.  "A state court decision constitutes an unreasonable application of clearly established federal law if the state court identifies the correct governing legal rule . . . but unreasonably applies it to the facts of the particular state prisoner's case." Id. at 1051–52 (internal quotation marks omitted).

For AEDPA purposes, we look to the last reasoned state-court decision.  In Shirley's case, that's the California Court of Appeal's decision holding that the

photo lineup was "not impermissibly suggestive."  <u>People</u> v. <u>Shirley</u>, No.

C050173, 2007 WL 1302512, at *7 (Cal. Ct. App., May 4, 2007).

> 1.  <u>Reasonableness of the state-court determination regarding suggestiveness</u>

The Supreme Court has held that "each case must be considered on its own

facts" and that the test for suggestiveness is whether the lineup "give[s] rise to a

very substantial likelihood of irreparable misidentification."  <u>Simmons</u>, 390 U.S. at

384.  The Court of Appeal nonetheless blazed its own trail by applying a test that

makes it much harder for a defendant to show suggestiveness than required by the

Supreme Court.

The Court of Appeal held that "[a] photographic lineup is sufficiently neutral

where the persons in the photographs are similar in age, complexion, physical

features, and build."  <u>Shirley</u>, 2007 WL 1302512, at *6.  If that were true, however,

some of the Supreme Court's own examples of suggestiveness would not qualify.

For example, the <u>Wade</u> Court labeled as suggestive those lineups where "only the

suspect was required to wear distinctive clothing which the culprit allegedly wore"

or where "the participants in the lineup are asked to try on an article of clothing

which fits only the suspect."  388 U.S. at 233.  The Supreme Court found these

practices impermissibly suggestive, but they would easily pass muster under the

Court of Appeal's test, so long as the "age, complexion, physical features, and build" of the people in the lineup were similar.

The Court of Appeal went on to insist that the "courts have upheld the validity of lineup identifications despite disparities among the participants," such as that "the defendant was the only person in jail clothing." <u>Shirley</u>, 2007 WL 1302512, at *6. This would set the bar for due process violations high, indeed—if it were true. But the case the Court of Appeal relied on, <u>People</u> v. <u>Johnson</u>, said no such thing. The California Supreme Court made clear in <u>Johnson</u> that the mug shot of the jail-uniformed defendant showed him "only from the chest upward so that it appeared he was wearing a gold shirt over a T-shirt" and emphasized that the witness "was unaware defendant was wearing jail clothes in the photograph." <u>People</u> v. <u>Johnson</u>, 842 P.2d 1, 15 (Cal. 1992). The Court of Appeal obviously misunderstood <u>Johnson</u> and the U.S. Supreme Court caselaw <u>Johnson</u> was explicating.

The Court of Appeal was also under the mistaken impression that one of its sister courts, in discussing suggestiveness, "rejected a similar claim where the defendant was the only individual in a six-person lineup with a bad eye." <u>Shirley</u>, 2007 WL 1302512, at *7. The case the Court of Appeal relied on actually left open the question whether it was suggestive to have a lineup where only one

person had a "bad eye."  <u>People</u> v. <u>Smith</u>, 109 Cal. App. 3d 476, 487 (1980).[1]

The Court of Appeal's misreading of federal and state caselaw led it to apply an impermissibly stringent standard for suggestiveness.  This improper standard explains how the Court of Appeal could have concluded that "the lineup was not impermissibly suggestive" in Shirley's case.  <u>Shirley</u>, 2007 WL 1302512, at *7. The decision is therefore "contrary to . . . clearly established Federal law."  28 U.S.C. § 2254(d)(1).  It's not entitled to AEDPA deference, so this court must decide the question de novo.

## 2.  <u>Suggestiveness of the lineup on the merits</u>

The lineup's suggestiveness is easy to see, as Appendix A shows.  Though the six people depicted in the photos are all black men of roughly the same age, with light facial hair and bald—or very close-cropped—scalps, their eyes tell them apart.  Shirley's eyes are severely crossed; the five others' aren't.  The extra attention Shirley received as a result of his crossed eyes would be troubling enough if his eyes were a random feature of the photograph.  But, what makes the lineup particularly suspect is that the crossed eyes were an integral part of the description

---

[1]  In <u>Smith</u>, unlike here, there were strong indications of independent reliability.  One witness had known the suspect for months and the other had spent "an appreciable period of time" with him on the day of the crime.  <u>Smith</u>, 109 Cal. App. 3d at 487–88.

given by the store clerk, the key witness to the robbery.

The record amply demonstrates how important the crossed eyes were to the clerk's identification of the robber:  The clerk told investigators soon after the crime that the robber "looked like he was cross-eyed."  When shown the lineup, the clerk said:  "That's him.  I remember those eyes."  At trial, the prosecutor showed the photo lineup to the jury and asked the clerk:  "[W]hat is it about that photograph that you recognize as being the man who robbed you?"  The clerk responded:  "I recognized his face.  I, I remember his face."  "Were there particular things about his face that you remembered?"  "His eyes," the clerk said.  "[D]id you recognize other features of his face or did you point just to the man who had cross eyes on [sic] the lineup?" the prosecutor asked, attempting to lead the witness away from emphasizing the crossed eyes.  "I recognize his whole face . . . [H]is face was like imprinted in my mind."  But the clerk couldn't mention anything specific about the robber's face <u>except</u> the eyes.  As the prosecutor himself reinforced:  "The only distinguishing characteristic is the cross eyes . . ."  Clearly the eyes were critical to the identification.  Thus, this lineup with just one cross-eyed man falls squarely within the examples of suggestiveness described by the Supreme Court in <u>Wade</u>, 388 U.S. at 232–33.

This conclusion is in keeping with a number of circuit cases.  <u>See, e.g.,</u> <u>Israel</u>

v. <u>Odom</u>, 521 F.2d 1370, 1371, 1372, 1374 (7th Cir. 1975) (lineup was suggestive where victim testified that "outstanding feature of the intruder's appearance was his glasses" and defendant was the only one in lineup wearing glasses); <u>Raheem</u> v. <u>Kelly</u>, 257 F.3d 122, 135–36 (2d Cir. 2001) (lineup was "plainly suggestive" where two witnesses emphasized robber's black leather coat and defendant was the only one in the lineup with such a coat); <u>United States</u> v. <u>Williams</u>, 469 F.2d 540, 547 (D.C. Cir. 1972) (Bazelon, C.J., concurring in part, dissenting in part) ("[L]ineup of four individuals wearing hats, along with a fifth, who was the prime suspect . . . and who was bareheaded was clearly improper."); <u>United States</u> v. <u>García-Álvarez</u>, 541 F.3d 8, 14–15 (1st Cir. 2008) (lineup was suggestive where perpetrator was described as speaking Spanish with a Dominican accent and defendant was the only one in the lineup who did so).

A suggestive identification is no trivial matter, as its taint may extend to subsequent identifications by the same witness.  As the Supreme Court stated in <u>Biggers</u>:  "Suggestive confrontations are disapproved because they increase the likelihood of misidentification, and unnecessarily suggestive ones are condemned for the further reason that the increased chance of misidentification is gratuitous." 409 U.S. at 198.  The fact that Shirley has an unusual, but easily identifiable, characteristic does not justify using a tainted identification procedure.  Quite the

contrary:  The presence of such an identifying characteristic redoubles the need to come up with a fair identification procedure because of the enhanced risk that the witness will identify the characteristic rather than the individual.

There is much the detective here could have done to come up with a fair photo spread.  As defense counsel pointed out before trial, the detective who assembled the lineup could have asked officers or even prisoners who looked similar to petitioner to cross their eyes for the photo lineup.[2]  Or he could have edited the pictures to create crossed eyes.  Appendix B contains the same lineup after the eyes have been crossed using basic photo-editing software.  No doubt, law enforcement professionals could do better.  After all, California detectives were editing mug shots by hand long before computers made the editing so easy.  See, e.g., People v. Slutts, 259 Cal. App. 2d 886, 891–92 (Cal. Ct. App. 1968) (detective drew a beard on a suspect's mug shot; court found this suggestive because officer "should have sketched beards on all of the photographs" in the lineup).  Finally, the sheriff's department could have used a live lineup where the face and eyes would have been less prominent than in the photo lineup.

_____

[2]  The detective wasn't exactly convincing when he insisted that it wasn't "possible" to get such photos because:  "I don't work around that many African American officers in my office to be able to do that, to bring them all in and do that.  Um, our department's a very large department.  It's scattered over 20 some offices within the County of Sacramento."

In short, it wasn't necessary for Shirley to be in a photo lineup where the face of the sole cross-eyed man leaps from the page.  Given that Shirley was already in custody with a high bond for the burglary charge, the lineup could have waited a few more days while the detective worked up a fair identification procedure.  Petitioner's crossed eyes, pronounced though they are, don't negate his due process right to be free from a suggestive lineup.

      3.  <u>Reasonableness of the state-court determination of independent reliability</u>

Once the lineup is found to be suggestive, the court must next decide whether the challenged identification "possesses sufficient aspects of reliability" such that the suggestiveness doesn't violate due process.  <u>Manson</u>, 432 U.S. at 106. In <u>Manson</u> and <u>Biggers</u>, the Supreme Court identified several factors to consider. The California Court of Appeal evaluated each of these factors in its opinion. <u>Shirley</u>, 2007 WL 1302512, at *7.  But the Court of Appeal misapplied Supreme Court law by not weighing these factors "[a]gainst . . . the corrupting effect of the suggestive identification itself."  <u>Manson</u>, 432 U.S. at 114.[3]  As a result of this failure, the Court of Appeal's determination of reliability is not entitled to AEDPA

---

[3] "The addition, deletion, or alteration of a factor in a test established by the Supreme Court also constitutes a failure to apply controlling Supreme Court law under the 'contrary to' clause of AEDPA."  <u>Benn</u>, 283 F.3d at 1051 n.5.

deference.  Therefore, this court must conduct the weighing de novo.

### 4.  Independent reliability on the merits

Factor 1:  The opportunity of the witness to view the criminal at the time of the crime.  The clerk saw the robber walk into the store and briefly spoke with him about the price of a cookie.  She saw him as he reached for the cash.  She had a clear, close-up view of his face.  This points toward reliability.

Factor 2:  The witness's degree of attention.  The clerk was tidying up the counter but generally paying attention to the robber as he asked about the price of a cookie, presented his dollar bill and then grabbed the money.  When the robber lunged, the clerk ran to the back office.  There, she had a much diminished view of the robber through a 10-inch television monitor, one quarter of which was trained on the register.  This factor points toward reliability.

Factor 3:  The accuracy of the witness's prior description of the criminal.  The clerk described the robber as a black man with a bald head.  That fits Shirley.  But it also fits many other men in Sacramento County.  And there are significant discrepancies between the clerk's description of the robber and Shirley's appearance.[4]  The clerk said the robber was 6'1" and 185 pounds.  The day after

---

[4]  The Court of Appeal concluded that "the discrepancies between [the
(continued...)

the robbery, Shirley's booking sheet listed him as 6'3", 230 pounds, though there

is a dispute whether the booking data was accurate.  In addition, the clerk did not

recall the mustache or the goatee that Shirley had on the day of his arrest.  This

undermines the reliability of the identification.  Of course, there are the robber's

crossed eyes, which do suggest a match with Shirley.  But we can't put too much

weight on the fact that the robber and Shirley both had crossed eyes because <u>that</u> is

the very feature this suggestive lineup accentuated.  The more weight we put on the

crossed eyes, the more suggestive the lineup becomes.  This cuts against reliability.

 <u>Factor 4:  The level of certainty demonstrated by the witness at the

confrontation.</u>  The clerk testified at trial that, when she identified Shirley five days

after the robbery, she was 100 percent sure he was the robber.  But there's nothing

contemporaneous to indicate her level of certainty.  The detective said it wasn't his

practice to write down on the photo lineup what a witness says.  And, according to

his testimony, what the detective remembered was that the clerk said:  "I recognize

---

 [4](...continued)
clerk's] description of defendant and information on sheriff's records is not
dispositive."  <u>Shirley</u>, 2007 WL 1302512, at *8.  But these discrepancies do play
into the reliability analysis.  By labeling the discrepancies "not dispositive"
without explanation, the Court of Appeal inexplicably excised them from the
analysis.

page 16

him.  I recognize those eyes."[5]  There's also the problem that the prosecutor

showed the suggestive lineup to the clerk just days before the trial, which raises the

concern that the clerk's professed certainty means only that the defendant was the

same person as the cross-eyed man in the lineup, not necessarily the robber.  As the

clerk admitted on cross, her testimony was based in part on her meeting with the

prosecutor.  Overall, this factor cuts against reliability.

Factor 5:  The length of time between the crime and the confrontation.  In

Manson, the Supreme Court dealt with an identification that took place two days

after the crime.  432 U.S. at 115–16.  In Shirley's case, the identification took place

five days after the crime.  Shirley concedes that "this factor likely favors

independent reliability," but the five-day delay is not insignificant in assessing the

weight to be given.  This factor weakly supports reliability.

Having weighed the factors of independent reliability against the "corrupting

effect of the suggestive identification itself," id. at 114, I find that the independent

_____

[5]  The Court of Appeal pointed out that the clerk described the robber's eyes
as (1) brown and (2) having yellowish whites—in addition to being crossed:
"Since [the cashier's] description of [the robber's] eyes was three-fold, her
reference to his 'eyes' was not necessarily limited to his one crossed eye."  Shirley,
2007 WL 1302512, at *7.  But this isn't compelling.  Even under magnification,
the lineup reveals no hint that the whites of the eyes were yellowish.  And a brown-
eyed black man isn't exactly unusual.  The reference to Shirley's eyes plainly
relates to the fact that they were crossed.

reliability doesn't overcome the suggestiveness of this lineup.  Under the totality of the circumstances, I find that the identification procedure violated due process.

### C.  Harmless Error

A federal habeas court "must assess the prejudicial impact of constitutional error in a state-court criminal trial under the 'substantial and injurious effect' standard set forth in Brecht [v. Abrahamson, 507 U.S. 619 (1993)]."  Fry v. Pliler, 551 U.S. 112, 121 (2007).  I must consider whether the jury would have convicted Shirley even without the tainted identification of the Subway clerk.

The jury heard testimony from Philip Lutz, who was sitting in a car outside of the Subway while the robbery occurred.  Though Lutz could not pick Shirley out of a lineup, he testified that he watched the robber come out of the store and get into a gray car.  Lutz followed that car and, while speaking to the 911 operator on his cellphone, read out the car's license plate.  The plate came back as registered to Shirley.  That the robber got into a car registered to Shirley is damning enough. It's even more so when combined with the clerk's testimony that the robber was a black man with crossed eyes.  The prosecutor put it plainly in closing argument:

> [W]hat are the chances that there's another man approximate description of this defendant, same race, same approximate height, build, whatever, who's also cross-eyed, who just happened to rob the Subway and leave in the defendant's car[?] . . .  What are the chances?

Slim to none, probably much, much closer to none than slim.

Even without the suggestive lineup and the resulting in-court identification, the jury still would almost certainly have convicted Shirley of the robbery.  Therefore, the use of the unconstitutionally suggestive identification procedure was harmless.

## II.     Sufficiency of the Evidence

For a sufficiency-of-the-evidence claim, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  <u>Jackson</u> v. <u>Virginia</u>, 443 U.S. 307, 319 (1979).  Petitioner claims the Court of Appeal "failed to address" whether a reasonable jury could have found that reaching across the counter was <u>intended</u> to produce fear or intimidation.  He blames the Court of Appeal for "focusing on [the clerk's] fear itself, rather than petitioner's conduct."  Shirley claims there's no evidence petitioner <u>intended</u> to use fear or intimidation to take the money.  He argues that the evidence may be sufficient to show he's "a thief and an opportunist," but not a robber.

While a rational jury could conclude that Shirley never intended to use "force or fear," a rational jury could also conclude the opposite—i.e., that Shirley

page 19

knew he'd be able to scare the clerk out of interfering with him when he lunged for the register.  Shirley was a foot taller than the clerk and almost twice her weight. There's enough evidence to suggest that he planned to accomplish the robbery by scaring the clerk.

## Conclusion

The petition is **DENIED** as to the suggestive lineup and sufficiency-of-the-evidence claims.  Because there are no further claims to adjudicate, the court directs the clerk to close the case and issue judgment for respondents.

A certificate of appealability shall issue for petitioner's claim that there was a violation of <u>Batson</u> v. <u>Kentucky</u>, 476 U.S. 79 (1986), as well as for the two claims denied by this order.

June 4, 2013

_____

**ALEX KOZINSKI**
Chief Circuit Judge
Sitting by designation
28 U.S.C. § 291(b)